John BOLLARD, Plaintiff–Appellant,

v.

THE CALIFORNIA PROVINCE OF THE SOCIETY OF JESUS; The Maryland Province of the Society of Jesus; The Oregon Province of the Society of Jesus; The Jesuit Conference; Father John Privett, S.J.; Father Andrew Sotelo, S.J.; Father Thomas Gleeson, S.J.; Father Anton Harris, S.J., Defendants–Appellees.

No. 98–16194.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 17, 1999

Filed Dec. 1, 1999

---

James M. Wagstaffe and Andrew I. Dilworth, Kerr & Wagstaffe, LLP, Mary Patricia Hough, Moss & Hough, San Francisco, California, for the plaintiff-appellant.

Paul E. Gaspari and Lawrence R. Jannuzzi, Tobin & Tobin, San Francisco, California, for defendants-appellees the California Province of the Society of Jesus, the Oregon Province of the Society of Jesus, Father John Privett, S.J., and the Jesuit Conference.

Deborah K. Miller, Landels Ripley & Diamond, San Francisco, California; Jeremiah C. Collins, Paul A. Murphy and Robert A. Van Kirk, Williams & Connolly, Washington, D.C., for defendants-appellees the Maryland Province of the Society of Jesus and Father Thomas Gleeson, S.J.

Michael J. Estep, Greene, Chauvel, Descalso & Tully, San Mateo, California, for defendant-appellee Father Andrew Sotelo, S.J.

William F. Terheyden, Littler Mendelson, San Francisco, California, for defendant-appellee Father Anton Harris, S.J.

Before: DAVID R. THOMPSON and FLETCHER, Circuit Judges, and SUSAN OKI MOLLWAY,[1] District Judge.

FLETCHER, Circuit Judge:

██ We must decide in this case whether the so-called "ministerial exception" to Title VII of the Civil Rights Act of 1964 bars plaintiff John Bollard's claim of sexual harassment against the Jesuit order. Simply stated, the ministerial exception insulates a religious organization's employment decisions regarding its ministers from judicial scrutiny under Title VII. The Free Exercise and Establishment Clauses of the First Amendment compel this exception to the otherwise fully applicable commands of Title VII when the disputed employment practices involve a church's freedom to choose its ministers or to practice its beliefs. Because Title VII applies without a constitutionally compelled exception where, as here, the defendant church is neither exercising its constitutionally protected prerogative to choose its ministers nor embracing the behavior at issue as a constitutionally protected religious practice, we find that plaintiff Bollard has stated a claim sufficient to overcome a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## I. Background

In August 1988, plaintiff John Bollard became a novice of the Society of Jesus, an order of Roman Catholic priests more commonly known as the Jesuits. As a novice, Bollard began the process of formation, during which men train and study to be ordained. Bollard alleges that, between 1990 and 1996, he was sexually harassed by his Jesuit superiors at the St. Ignatius College Preparatory School in San Francisco and at the Jesuit School of Theology in Berkeley, California. He claims that various superiors at these two institutions sent him pornographic material, made unwelcome sexual advances, and engaged him in inappropriate and unwelcome sexual discussions. Between mid–1995 and 1996, Bollard reported the harassment to superiors within the Jesuit order, but, so far as he knows, his reports prompted no corrective action. He alleges that the harassing conduct was so severe that he was forced to leave the Jesuit order in December 1996 before taking vows to become a priest.

Bollard filed a timely complaint of sexual harassment with the California Department of Fair Employment and Housing, which automatically cross-filed his complaint with the federal Equal Employment Opportunity Commission. He received a right-to-sue letter in January 1997 and filed a complaint in federal district court for the Northern District of California the following August. His complaint asserts a federal cause of action for sexual harassment in violation of section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), as well as state law claims for failure to investigate, for constructive wrongful discharge, and for breach of contract.

██ The district court found the ministerial exception applicable and held that Bollard had no valid claim under Title VII. It dismissed Bollard's Title VII claim for want of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and declined to exercise supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(c)(3). We review *de novo* a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1), *see Crist v. Leippe*, 138 F.3d 801, 803 (9th Cir.1998), which is the same standard under which we review a dismissal for failure to state a

---

1. Honorable Susan Oki Mollway, United States District Judge for the District of Hawaii, sitting by designation.

claim under Federal Rule of Civil Procedure 12(b)(6), *see Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998). At this stage in the proceedings, we take the allegations in Bollard's complaint as true. *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1099 (9th Cir.1999).

## II. *The Ministerial Exception to Title VII*

■ The ministerial exception to Title VII "precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 461 (D.C.Cir.1996). We have previously acknowledged the existence of such an exception in other circuits, but we have never been asked to define its scope or to apply it. *See EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1369–70 (9th Cir.1986); *EEOC v. Pacific Press Publ'g Ass'n*, 676 F.2d 1272, 1278 (9th Cir.1982).

■ The source of the ministerial exception is the Constitution rather than the statute. *See, e.g., Fremont Christian Sch.*, 781 F.2d at 1365; *Pacific Press*, 676 F.2d at 1276; *Rayburn v. General Conf. of Seventh–Day Adventists*, 772 F.2d 1164, 1167 (4th Cir.1985). Insofar as race, sex, and national origin are concerned, the text of Title VII treats an employment dispute between a minister and his or her church like any other employment dispute. The statute does provide two exemptions from its non-discrimination mandate for religious groups. One permits a religious entity to restrict employment "connected with the carrying on ... of its activities" to members of its own faith, 42 U.S.C. § 2000e–1(a); the other permits parochial schools to do the same, *id.* § 2000e–2(e). But neither of these statutory exceptions removes race, sex, or national origin as an impermissible basis of discrimination against employees of religious institutions. Nor do they single out ministerial employ-

ees for lesser protections than those enjoyed by other church employees.

Despite the lack of a statutory basis for the ministerial exception, and despite Congress' apparent intent to apply Title VII to religious organizations as to any other employer, courts have uniformly concluded that the Free Exercise and Establishment Clauses of the First Amendment require a narrowing construction of Title VII in order to insulate the relationship between a religious organization and its ministers from constitutionally impermissible interference by the government. *See, e.g., Combs v. Central Texas Annual Conf. of United Methodist Church*, 173 F.3d 343 (5th Cir.1999); *Catholic Univ.*, 83 F.3d 455; *Young v. Northern Ill. Conf. of United Methodist Church*, 21 F.3d 184 (7th Cir.1994); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360 (8th Cir.1991); *Rayburn*, 772 F.2d 1164; *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.1972). These First Amendment restrictions on Title VII provide important protections to churches that seek to choose their representatives free from government interference and according to the dictates of faith and conscience.

### A. *The Free Exercise Clause*

■ The Free Exercise Clause of the United States Constitution provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I. The Free Exercise Clause restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs. *See, e.g., Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (explaining that the Free Exercise Clause protects the power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"); *see also Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037,

4 L.Ed.2d 1140 (1960) (per curiam) (forbidding the courts as well as the legislature from interfering with Free Exercise rights). In determining whether the proposed application of a statute would violate the Free Exercise Clause, courts must weigh three factors: "(1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state." *Pacific Press*, 676 F.2d at 1279; *see also Sherbert v. Verner*, 374 U.S. 398, 403–07, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

 Some religious interests under the Free Exercise Clause are so strong that no compelling state interest justifies government intrusion into the ecclesiastical sphere. A secular court may not, for example, adjudicate matters that necessarily require it to decide among competing interpretations of church doctrine, or other matters of an essentially ecclesiastical nature, even if they also touch upon secular rights. *See, e.g., Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (reversing the Illinois Supreme Court's determinations regarding several matters of internal church governance, because "religious controversies are not the proper subject of civil court inquiry"); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (explaining that "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice"); *Kedroff*, 344 U.S. at 115, 73 S.Ct. 143 (prohibiting judicial resolution of the question of which church patriarch was entitled to use St. Nicholas Cathedral because it is "strictly a matter of ecclesiastical government"); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S.Ct. 5, 74

L.Ed. 131 (1929) (holding that a secular court may not decide competing claims to a chaplaincy, because "the appointment is a canonical act, [and] it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them"); *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729, 20 L.Ed. 666 (1871) ("It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.").

 A church's selection of its own clergy is one such core matter of ecclesiastical self-governance with which the state may not constitutionally interfere. *See, e.g., Milivojevich*, 426 U.S. at 717, 96 S.Ct. 2372; *Kedroff*, 344 U.S. at 116, 73 S.Ct. 143; *Gonzalez*, 280 U.S. at 16, 50 S.Ct. 5. A church must retain unfettered freedom in its choice of ministers because ministers represent the church to the people. As the Fifth Circuit has written, they act as the church's "lifeblood." *McClure*, 460 F.2d at 558. Indeed, the ministerial relationship lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions. *See Rayburn*, 772 F.2d at 1169 ("[T]he free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it."); *see also Young*, 21 F.3d at 186; *Scharon*, 929 F.2d at 363. In the words of the Fifth Circuit,

> [W]e cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread, the internal management of a church.

*Combs*, 173 F.3d at 350.

 Because the plain language of Title VII purports to reach a church's

employment decisions regarding its ministers, courts have had to carve a ministerial exception out of Title VII in order to reconcile the statute with the Constitution. But the scope of the ministerial exception to Title VII is limited to what is necessary to comply with the First Amendment. For example, it does not apply to lay employees of a religious institution if they are not serving the function of ministers. *See Fremont Christian Sch.,* 781 F.2d 1362; *Pacific Press,* 676 F.2d 1272. In the case of lay employees, the particularly strong religious interests surrounding a church's choice of its representative are missing, and we have concluded that applying Title VII is constitutionally permissible.

■ In this case, as in the case of lay employees, the Free Exercise rationales supporting an exception to Title VII are missing. The Jesuits do not offer a religious justification for the harassment Bollard alleges; indeed, they condemn it as inconsistent with their values and beliefs. There is thus no danger that, by allowing this suit to proceed, we will thrust the secular courts into the constitutionally untenable position of passing judgment on questions of religious faith or doctrine. The Jesuits' disavowal of the harassment also reassures us that application of Title VII in this context will have no significant impact on their religious beliefs or doctrines. *See Fremont Christian Sch.,* 781 F.2d at 1368; *Pacific Press,* 676 F.2d at 1279.

Moreover, this is not a case about the Jesuit order's choice of representative, a decision to which we would simply defer without further inquiry. Bollard does not complain that the Jesuits refused to ordain him or engaged in any other adverse personnel action. *Cf. McClure,* 460 F.2d at 559 ("Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church."). On the contrary, according to the allegations in Bollard's complaint, the Jesuit order has enthusiastically encouraged Bollard's pursuit of the priesthood. It is true that Bollard alleges constructive discharge, but unlike actual discharge, constructive discharge does not refer to a decision by the Jesuits to terminate Bollard's employment. Instead, constructive discharge in the context of Bollard's Title VII sexual harassment claim functions only to signal his estimation of the severity of the harassment and to lay the foundation for including lost wages in a calculation of damages.

■ The only relevant decision that we can reasonably attribute to the Jesuits on the facts alleged here is the decision not to intervene to stop or curtail the sexual harassment Bollard reported. *See Black v. Snyder,* 471 N.W.2d 715, 723 (Minn.Ct. App.1991) (Randall, J., dissenting). But, in our view, it strays too far from the rationale of the Free Exercise Clause to extend constitutional protection to this sort of disciplinary inaction simply because a minister is the target as well as the agent of the harassing activity. That Bollard has sued under an employment discrimination statute does not mean that the aspect of the church-minister employment relationship that warrants heightened constitutional protection—a church's freedom to choose its representatives—is present. The Free Exercise Clause rationale for protecting a church's personnel decisions concerning its ministers is the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant. That rationale does not apply here, for the Jesuits most certainly do not claim that allowing harassment to continue unrectified is a method of choosing their clergy. Because there is no protected-choice rationale at issue, we intrude no further on church autonomy in allowing this case to proceed than we do, for example, in allowing parishioners' civil suits against a church for the negligent supervi-

sion of ministers who have subjected them to inappropriate sexual behavior. *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 10 F.Supp.2d 138 (D.Conn.1998); *Nutt v. Norwich Roman Catholic Diocese*, 921 F.Supp. 66 (D.Conn. 1995); *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo.1993).

Thus, we believe that we must apply the *Sherbert* balancing test in roughly the same manner as in cases involving lay employees in order to determine whether the application of Title VII in this case would violate the Free Exercise Clause. We conclude that it would not. Because the Jesuit order doctrinally disavows the harassment, the danger that the application of Title VII in this case will interfere with its religious faith or doctrine is particularly low. And while we recognize that applying any laws to religious institutions necessarily interferes with the unfettered autonomy churches would otherwise enjoy, this sort of generalized and diffuse concern for church autonomy, without more, does not exempt them from the operation of secular laws. Otherwise, churches would be free from all of the secular legal obligations that currently and routinely apply to them. For these reasons, we do not think that applying Title VII in the circumstances of this case will have an unconstitutional impact on the free exercise of the Jesuits' religious beliefs. At the same time, the strength of the government's interest, expressed in the text of Title VII, in protecting employees against sexual harassment is difficult to overstate. As we have said previously, it is a matter of the "highest priority." *Pacific Press*, 676 F.2d at 1280. Further, we know from the text of Title VII that Congress intended it to apply to churches. Where the church pro-

vides no doctrinal nor protected-choice based rationale for its alleged actions, and indeed expressly disapproves of the alleged actions, a balancing of interests strongly favors application of the statute. We therefore conclude that Bollard's sexual harassment claim does not run afoul of the Free Exercise Clause.

### B. *The Establishment Clause*

■■■ The Establishment Clause serves as a separate constitutional basis for the ministerial exception to Title VII. It provides that "Congress shall make no law respecting an establishment of religion ..." U.S. Const. amend. I. In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court articulated a three-part test to determine whether a statute violates the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Id.* at 612–13, 91 S.Ct. 2105 (internal citations and quotations omitted).[2] This court has already held that Title VII has an obvious secular legislative purpose, and that its principal effect neither advances nor inhibits religion. *Pacific Press*, 676 F.2d at 1281–82. The only open question is whether applying Title VII in the circumstances of this case would foster an impermissible government entanglement with religion.

■■■ Entanglement has both substantive and procedural dimensions. On a substantive level, applying the statute to the clergy-church employment relationship

---

**2.** We realize that dissatisfaction with the *Lemon* test has led several Justices to advocate alternative analytical frameworks, *see, e.g., Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Kennedy, J.) (advocating and applying a coercion test); *Lynch v. Donnelly*, 465 U.S. 668, 688–94, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) (advocating adoption of an en-

dorsement test). A new Establishment Clause test may well be on the horizon. *See generally* Kent Greenawalt, *Quo Vadis: The Status and Prospects of "Tests" Under the Religion Clauses*, 1995 Sup.Ct. Rev. 323, 359–60. Still, because the Court has not yet reached consensus on *Lemon*'s successor, we continue to apply its test.

creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake. A religious organization's decision to employ or to terminate employment of a minister is at the heart of its religious mission. The "determination of 'whose voice speaks for the church' is *per se* a religious matter. . . . We cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the 'gifts and graces' of a minister must be left to ecclesiastical institutions." *Minker v. Baltimore Annual Conf. of United Methodist Church,* 894 F.2d 1354, 1356–57 (D.C.Cir. 1990) (holding that the First Amendment prevented a claim under the federal Age Discrimination in Employment Act). "The application of Title VII to employment decisions of this nature would result in an intolerably close relationship between church and state. . . ." *Rayburn,* 772 F.2d at 1170. Nor may a court be in the "impermissible position of having 'to evaluate . . . competing opinions on religious subjects.'" *Catholic Univ.,* 83 F.3d at 465 (applying the ministerial exception to Title VII in a case involving the denial of tenure to a professor of canon law). But as we have explained above in discussing the Free Exercise Clause, such substantive concerns are absent from this case.

▮▮▮▮ As a procedural matter, "entanglement might also result from a protracted legal process pitting church and state as adversaries. . . ." *Rayburn,* 772 F.2d at 1171; *see also NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."). As the Fourth Circuit explained in *Rayburn,*

> A Title VII action is potentially a lengthy proceeding, involving state agencies and commissions, the EEOC, the federal trial courts and courts of

appeal. Church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers. The remedies that a district court may impose, 42 U.S.C. § 2000e–5(g) (1982), may be far-reaching in their impact upon religious organizations. Even after entry of judgment, questions of compliance may result in continued court surveillance of the church's policies and decisions.

772 F.2d at 1171. Of this list of concerns, we believe that the potential for protracted government surveillance of church activities poses the gravest concern under the Establishment Clause. *See, e.g., Aguilar v. Felton,* 473 U.S. 402, 413, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), *overruled on other grounds by Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("[P]ervasive monitoring by public authorities . . . infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement.").

▮▮▮ In a Title VII case, the dangers of procedural entanglement are most acute where there is also a substantive entanglement at issue. *See Catholic Univ.,* 83 F.3d at 467; *Scharon,* 929 F.2d at 363; *Rayburn,* 772 F.2d at 1171. Where such a concern is absent, procedural entanglement considerations are reduced to the constitutional propriety of subjecting a church to the expense and indignity of the civil legal process. In this case, we believe that the entanglement between church and state that would result if Bollard pursued his sexual harassment claim is not sufficiently significant to violate the Establishment Clause.

The issue in the case is whether Bollard was subjected to sex-based harassment by his superiors that was sufficiently severe or pervasive as to be actionable under Title VII. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2264, 2270, 141 L.Ed.2d 633 (1998). The Jesuit order may assert as an affirmative defense

that it exercised reasonable care to prevent and correct the harassment, and that Bollard failed to take advantage of these opportunities to avoid or limit harm. *Id.* at 2270. This is a restricted inquiry. Nothing in the character of this defense will require a jury to evaluate religious doctrine or the "reasonableness" of the religious practices followed within the Jesuit order. Instead, the jury must make secular judgments about the nature and severity of the harassment and what measures, if any, were taken by the Jesuits to prevent or correct it. The limited nature of the inquiry, combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters.

Further, Bollard seeks damages as his sole remedy. He seeks neither reinstatement nor any other equitable relief that might require continuing court surveillance. Nor, beyond filing his initial claim, awaiting receipt of the standard right-to-sue letter, and filing his complaint in district court, has Bollard involved any government entity. Given the limited and retrospective nature of the damages remedy Bollard seeks, it is clear that none of these entities will be involved in future or ongoing monitoring of church activities.

Taken as a whole, we conclude that the procedural entanglement between church and state that will result from allowing Bollard to pursue his claim is no greater than that attendant on any other civil suit a private litigant might pursue against a church. Accordingly, we fail to see an Establishment Clause violation in applying the commands of Title VII to this case.

### III. *State Law Claims*

Bollard included in his complaint claims under California law for failure to investigate, for constructive discharge, and for breach of contract. When the district court dismissed Bollard's claim under Title VII, it dismissed those claims under the federal supplemental jurisdiction statute, 28 U.S.C. § 1367(c). Because we hold that Bollard has stated a claim under Title VII, the dismissal of his state law claims is no longer warranted. Assuming the district court reaches the merits of Bollard's state law claims on remand, it will have to perform the same First Amendment analysis with respect to those claims as the analysis we have performed with respect to Bollard's claim under Title VII. We do not mean inappropriately to anticipate the legal analysis of the district court by stating here what is already obvious: The fact that Bollard's Title VII claim for sexual harassment may go forward despite the First Amendment does not necessarily mean that his state law claims may also go forward.

■■■ As the analysis earlier in this opinion makes clear, the ministerial exception to Title VII is based not on Title VII but, rather, on the First Amendment. Just as there is a ministerial exception to Title VII, there must also be a ministerial exception to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers. To take a clear example, had Bollard brought a state law claim for breach of contract with an associated remedy of reinstatement, that would run afoul of the Free Exercise Clause because the remedy would require the church to employ Bollard, thereby interfering with the church's constitutionally protected choice of its ministers. Whether the exception applies in a particular instance will depend on the nature of the state law claim and its associated remedy, and the district court will be in a position to undertake that analysis on remand.

### IV. *Nature of the District Court's Dismissal*

■■■ Upon finding that the ministerial exception applied to Bollard's claim under Title VII, the district court dismissed his complaint under Federal Rule of Civil Procedure 12(b)(1) for want of

subject matter jurisdiction. We reverse that dismissal, but we also wish to make clear that, had Bollard's claim indeed been barred, it should have been dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Failure to state a claim under federal law is not the same thing as failure to establish federal question jurisdiction under 28 U.S.C. § 1331. Any non-frivolous assertion of a federal claim suffices to establish federal question jurisdiction, even if that claim is later dismissed on the merits under Rule 12(b)(6). As the Supreme Court wrote in *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946),

> Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.... If the court ... exercise[s] its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

*See also Wheeldin v. Wheeler,* 373 U.S. 647, 649, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) ("We agree ... that on the face of the complaint the federal court had jurisdiction.... But on the undisputed facts, ... no federal cause of action can be made out."). Bollard asserted a non-frivolous federal claim, and even if the district court had been correct in dismissing it, that dismissal should have been on the merits under Rule 12(b)(6) for failure to state a claim for which relief can be granted.

We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.