Mary ROSATI, Plaintiff

v.

TOLEDO, OHIO CATHOLIC DIOCESE, et al., Defendants

No. 3:02CV7171.

United States District Court, N.D. Ohio, Western Division.

Dec. 3, 2002.

David N. Haring, James J. Heck, Brown, BeMiller, Murray & McIntyre, Mansfield, OH, for Plaintiff.

Gregory T. Lodge, Shumaker, Loop & Kendrick, Toledo, OH, for Defendant.

### ORDER

CARR, District Judge.

Plaintiff Mary Rosati brings this suit against defendants the Catholic Diocese for Toledo, Ohio ("Diocese") and the Contemplative Order of the Sisters of the Visitation of Toledo, Ohio ("Sisters of the Visitation" or the "Order") claiming violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et. seq.*, Ohio Revised Code § 4112.02(A), and intentional or negligent infliction of emotional distress. This court has jurisdiction pursuant

to 28 U.S.C. §§ 1331 and 1367. Pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, defendants' motion shall be granted.

## BACKGROUND

The Sisters of the Visitation is an independent religious order affiliated with the Roman Catholic Church. The Sisters of the Visitation are a separate entity from the Diocese but obtain health insurance through the Diocesan plan.

Members of the Sisters of the Visitation lead a cloistered existence, dedicating their lives to prayer and religious contemplation. The Order's affairs are regulated by the Mother Superior and her Council. The Mother Superior and her Council determine who may be admitted to the Order.

To become a member of the Sisters of the Visitation, a candidate must go through several steps. The first step is postulancy, a time of transition from secular life to life in the cloister. After six to twelve months, the candidate is then admitted to the novitiate. In the novitiate, the sister wears the nun's habit and begins her initiation into evangelical life. The novitiate usually lasts for two years. At the end of the novitiate, the candidate may then be admitted to "temporary profession." After three years, the sister takes perpetual vows and becomes a permanent member of the Order.

At any time during these steps, the Mother Superior may ask the candidate to leave if the candidate is determined to be unsuitable for the Order.

Plaintiff Mary Rosati entered the Order in February, 1999. In December, 1999, she was promoted from postulant to novice.

In April, 2000, plaintiff began experiencing health problems. She first suffered kidney problems. In August, 2000, plaintiff was diagnosed with breast cancer. In December, 2000, plaintiff experienced numbness in her arms and neck—unrelated to the cancer. This condition necessitated neurosurgery for a herniated disc.

On August 25, 2000, plaintiff attended a doctor's appointment for her breast cancer. Plaintiff was accompanied by the Mother Superior and Sister Mary Bernard, plaintiff's immediate supervisor. Plaintiff's doctor explained that plaintiff's treatment options included a lumpectomy or mastectomy and further cancer-related treatment. According to plaintiff and her doctor, once plaintiff's treatment options were discussed, Mother Superior remarked: "We will have to let her go. I don't think we can take care of her." The plaintiff's doctor responded to the statement by explaining how difficult it would be for plaintiff to obtain other heath insurance.

According to plaintiff, Sister Mary Bernard took the plaintiff aside later that day, and, for the first time, intimated that the plaintiff may not have been suited for the convent. Plaintiff claims Sister Bernard told her, "Maybe God is trying to tell you something. Perhaps you don't have a vocation."

The next day, plaintiff claims Sister Bernard recanted. Sister Bernard allegedly told plaintiff that the cancer was not about plaintiff having a vocation with the Order. Sister Bernard also allegedly told plaintiff that the Mother Superior was reconsidering whether plaintiff should be let go and that the Order was going to walk plaintiff through the illness and recovery process.

In December, 2000, plaintiff claims Sister Bernard again questioned plaintiff's suitability of becoming a nun. Sister Bernard allegedly told plaintiff, "You have too many physical problems. Don't you think God is trying to tell you something?"

On January 17, 2001, Sister Bernard informed plaintiff that the Council had voted to let her go. Plaintiff was told that Council felt that, with her health problems, plaintiff would be better off outside the Order.

According to the current Mother Superior, plaintiff was discharged because:

> [W]e concluded that she was not called to our way of life. This was done by looking at the spirit of the Order, the demands of the cloistered contemplative life lived in community (all defined in our Constitutions and our own experience), and Mary Rosati's response. The Superior and the Council determined that Mary Rosati was unsuited (not called) to our way of life.

Gworek Aff. at 4.

As a result of her discharge, plaintiff lost her health insurance.

In April, 2002, plaintiff brought this lawsuit claiming that she was terminated in violation of the ADA and Ohio's antidiscrimination statutes. Plaintiff also claims she has been subjected to intentional or negligent infliction of emotional distress as a result of her discharge. Defendants move this court for summary judgment based on the Free Exercise Clause, the Establishment Clause, and the First Amendment Right of Association.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

### I. The Ministerial Exception under the First Amendment

The First Amendment to the United States Constitution provides, in part, that

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"

The U.S. Supreme Court has long held that on matters of church discipline, faith, practice, and religious law, the Free Exercise Clause requires civil courts to refrain from interfering with the determinations of the "highest of these church judicatories to which the matter has been carried." *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1871).

In *Watson,* the Court recognized the "unquestioned" right of religious organizations to create tribunals which decide controversies over faith within the associations. *Id.* at 728–29. The Court stated: "it would be vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Id.* at 729.

The Supreme Court affirmed that doctrine in *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), stating: "This principle [of requiring civil courts to refrain from deciding religious doctrinal disputes] applies with equal force to church disputes over church polity and church administration." *Id.* at 710, 96 S.Ct. 2372.

The Sixth Circuit has also recognized this doctrine. *See e.g., Lewis v. Seventh Day Adventists Lake Region Conference,* 978 F.2d 940 (6th Cir.1992); *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.1986).

In *Hutchison,* the Sixth Circuit affirmed the dismissal of a suit by a minister against the church that allegedly forced him into retirement by misapplying provisions of church law. The court found that a minister's employment relationship with his church implicated "internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law." *Id.* at 396. Therefore, civil court jurisdiction over a ministerial employment dispute was impermissible because such state intervention would excessively inhibit religious liberty. *Id.; see also Lewis,* 978 F.2d at 942 ("We conclude that the First Amendment bars civil courts from reviewing decisions of religious judicatory bodies relating to the employment of clergy.").

The Sixth Circuit's decisions in *Hutchison* and *Lewis* are in accord with several cases in other circuits which have declined to exercise jurisdiction in employment disputes between churches and their clergy. This doctrine has been commonly referred to as the "ministerial exception." *See EEOC v. Roman Catholic Diocese,* 213 F.3d 795, 800 (4th Cir.2000) (recognizing that the ministerial exception is the "well-settled law of [the Fourth] circuit, [and] is widely recognized by other courts of appeals," and affirming the lower court's dismissal of a music minister's Title VII sex discrimination claim); *Gellington v. Christian Methodist Episcopal Church, Inc.,* 203 F.3d 1299, 1304 (11th Cir.2000) (affirming dismissal of a minister's Title VII claims based on ministerial exception); *Bollard v. California Province of the Society of Jesus,* 196 F.3d 940, 944 (9th Cir. 1999) ("The Free Exercise and Establishment Clauses of the First Amendment compel [the ministerial] exception to the otherwise fully applicable commands of Title VII when the disputed employment practices involve a church's freedom to choose its ministers or to practice its beliefs."); *Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994) (affirming the dismissal of a probationary minister's Title VII claims of race discrimination, sex discrimination, and retaliation based on the First Amendment); *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.1972) (one of the first courts to find that a minister cannot maintain a suit against a church

under Title VII based on the First Amendment).

The ministerial exception is not limited to ordained clergy. Application of the doctrine depends on the function of the position and not on categorical notions of who is or is not a minister. *EEOC v. Roman Catholic Diocese of Raleigh, North Carolina,* 213 F.3d 795, 801 (4th Cir.2000).

For example, in *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164 (4th Cir.1985)—which the Sixth Circuit followed and cited with approval in *Hutchinson*—the Fourth Circuit found that the ministerial exception prevented application of Title VII protection to a non-ordained associate in pastoral care in the Seventh-day Adventist Church. According to the court: "The role of an associate in pastoral care is so significant in the expression and realization of Seventh-day Adventist belief that state intervention in the appointment process would excessively inhibit religious liberty." *Id.* at 1168; *see also EEOC v. Catholic Univ. of America,* 83 F.3d 455, 461 (D.C.Cir.1996) (finding that the ministerial exception barred a nun's Title VII sex discrimination claims because the exception is extended to "lay employees of religious institutions whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order or participation in religious ritual and worship") (internal quotations omitted).

The court in *Rayburn* enunciated a general rule to determine if a plaintiff is a "minister" under the exception: "if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered clergy." *Rayburn,* 772 F.2d at 1169 (internal quotations omitted). Thus, a court must "determine whether a position is important to the spiritual and pastoral mission ·of the church" in order to decide whether the ministerial exception applies. *Id.*

The ministerial exception, however, does not entirely insulate the religious employer from the operation of federal antidiscrimination statutes. As the Fourth Circuit recently explained: "the exception would not apply to employment decisions concerning purely custodial or administrative personnel... Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." *Roman Catholic Diocese of Raleigh,* 213 F.3d at 801.

In this case, a nun is obviously important to the spiritual and pastoral mission of the Catholic Church. Thus, defendants' decision to terminate plaintiff's membership from the Order falls within the ministerial exception. It was an ecclesiastical decision that the Free Exercise Clause of the First Amendment places beyond the reach of this court.

## II. The *Bollard* Decision

Plaintiff does not dispute the applicability of the ministerial exception to her claims. Rather, plaintiff argues that a *per se* application of the ministerial exception is improper. Application of the ministerial exception is not absolute, according to the plaintiff, and should be "done more thoughtfully and on a case-by-case basis." Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 7. Plaintiff wants this court to follow her interpretation of *Bollard v. California Province of the Society of Jesus,* 196 F.3d 940 (9th Cir.1999).

In *Bollard,* the plaintiff, John Bollard, was a novice of the Society of Jesus, an order of Roman Catholic Priests. The plaintiff alleged he was sexually harassed by his Jesuit superiors and that the

harassment was so severe, he was forced to leave the Jesuit school before becoming a priest. The plaintiff later filed a sexual harassment claim under Title VII.

The Ninth Circuit found that the ministerial exception did not apply to Bollard's claim; thus, his Title VII claim could go forward. The Free Exercise rationales supporting an exception to Title VII were missing. The court explained:

> The Jesuits do not offer a religious justification for the harassment Bollard alleges; indeed, they condemn it as inconsistent with their values and beliefs. There is thus no danger that, by allowing this suit to proceed, we will thrust the secular courts into the constitutionally untenable position of passing judgment on questions of religious faith or doctrine.

*Id.* at 947.

Thus, the Jesuit order was "neither exercising its constitutionally protected prerogative to choose its ministers nor embracing the behavior at issue as a constitutionally protected religious practice." *Id.* at 944.

Plaintiff interprets the *Bollard* decision as requiring defendant-religious organizations to demonstrate a religious justification for the employment decision in order to invoke the ministerial exception. Plaintiff argues that because defendants do not provide evidence or directly deny that the decision to discharge her was based on her disabilities, a question of fact exists as to whether a religious basis, as opposed to an illegal basis, exists for the employment decision.

Plaintiff, however, misapplies *Bollard.* The decision in *Bollard* hinged on the fact that the alleged aggrieved conduct did not involve the defendants' ministerial selection process. The court stated:

> [T]his is not a case about the Jesuit order's choice of representative, a decision to which we would simply defer

without further inquiry. Bollard does not complain that the Jesuits refused to ordain him or engaged in any other adverse personnel action...On the contrary, according to the allegations in Bollard's complaint, the Jesuit order has enthusiastically encouraged Bollard's pursuit of the priesthood.

*Id.* at 947.

In this case, defendants were determining whether plaintiff was suitable to become a member of the Sisters of the Visitation. Plaintiff was subsequently determined to be unsuitable for the Order, and she was asked to leave. Thus, in contrast to *Bollard,* defendants were exercising their constitutionally protected prerogative to choose their minister. Defendants' decision is, therefore, protected by the ministerial exception.

As the Fourth Circuit concluded in *Rayburn,* the church need not proffer any religious justification for its employment decision because the Free Exercise Clause "protects the act of a decision rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." 772 F.2d at 1169.

### III. Plaintiff's Claims

The ministerial exception is based on the First Amendment. Therefore, just as there is a ministerial exception to Title VII, there must also be a ministerial exception to ADA claims and to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers. *Bollard,* 196 F.3d at 950. *See e.g., Hutchison,* 789 F.2d at 393 (affirming the district court's dismissal of plaintiff's claims of fraudulent, collusive, or arbitrary action, defamation, intentional infliction of emotional distress, and breach of contract).

Therefore, plaintiff's claims are beyond the reach of this court. The First Amendment requires churches to be free from government interference in matters of church governance and administration.

## CONCLUSION

It is, therefore,

**ORDERED THAT**

The defendants' motion for summary judgment be, and hereby is, granted.

**So ordered.**