Reverend Melvin S. MUNDIE,
Appellant

v.

CHRIST UNITED CHURCH
OF CHRIST, Appellee.

Superior Court of Pennsylvania.

Submitted Sept. 28, 2009.

Filed Dec. 31, 2009.

Edward G. Puhl, Gettysburg, for appellant.

Douglas H. Gent, Hanover, for appellee.

BEFORE: BENDER, GANTMAN, and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Reverend Melvin S. Mundie appeals the order sustaining Appellee Christ United Church of Christ's preliminary objection and dismissing Appellant's complaint for lack of subject matter jurisdiction. After careful review, we reverse.

¶ 2 When this Court sits in review of an order sustaining a preliminary objection, we are to ascertain the pertinent facts solely from the complaint. *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 272 (2005). Pursuant to this standard of review, we accept as true "all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts." *Connor v. Archdiocese of Philadelphia*, 601 Pa. 577, 975 A.2d 1084, 1085 (2009) (citation omitted).[1] As gar-

1. In like fashion, we need not accept any conclusions of law or argumentative allega-

nered from the allegations in the complaint *sub judice,* the salient facts are as follows.

¶ 3 On the 11th day of April, 1999, Appellant became employed under a "covenant of ministry" by Appellee as interim pastor, which status was upgraded to pastor in November of 1999 by the then-seated church Consistory.[2] At all times herein relevant, Appellant's duties as pastor consisted of the following:

(A) giving intentional leadership to the development tasks of the pastoral period by promoting and supporting new leadership, strengthening and renewing community and denominational linkage, establishing and confirming new directions in ministry;

(B) preaching and leading the worship life of the church;

(C) officiating at baptisms, weddings and funerals;

(D) leading confirmation classes, church school sessions and other educational programs;

(E) visiting the sick and shut-ins and counseling members;

(F) supervis[ing] clerical staff, daycare staff and associate Pastor; and

(G) Pastor's discretionary fund of several hundred dollars (audited annually).

Appellant's Complaint, 8/29/08, ¶ 6. It was not until May 26, 2005, that Appellant was provided employment protection, which was unanimously adopted at a Consistory meeting on May 22, 2005, in the form of a written agreement executed on May 26, 2005, the terms of which stated, in relevant part:

1. [Appellant's] call is extended from this date to June 30, 2007, a period of just over two years.

2. [...].

3. His salary for 2006 will include a cost of living increase, but only if the salaries of all employees receive the same cost of living increase.

4. His salary for the first half of 2007 will include a cost of living increase, but only if salaries of all employees receive the same cost of living increase.

5. The [Appellee] will maintain the [Appellant's] pension fund at 14 per cent of base salary, and provide a social security supplement at 7.65 per cent of base salary, as well as the current auto allowance throughout the length of this agreement.

6. The [Appellant] and [his wife] will continue to have the use of the parsonage throughout the length of this agreement.

7. [...].

8. This agreement can be amended only by the unanimous consent of both parties.

Appellant's Complaint, 8/29/08, ¶ 28. By letter dated June 21, 2006, twenty-two members of Appellee's congregation notified the president of the Consistory that they demanded a meeting to discuss what they perceived as "church problems." *Id.* at 30. The president of the Consistory notified the dissidents by letter dated July

---

tions made in the complaint. *Krentz v. Consol. Rail Corp.,* 589 Pa. 576, 910 A.2d 20, 26 (2006).

**2.** Within Appellee's by-laws, section 13 of the administrative structure states that the Consistory "shall be the official board of the congregation and shall have jurisdiction and con-

trol to [...] administer its business affairs; to formulate congregational policies [...]; and to be responsible to the congregation for promoting and maintaining [...] Christian education, evangelism, [...] benevolence, community service and Christian concern." *See* Appellant's Complaint, 8/29/08, ¶ 13.

9, 2006, that no such meeting would be held. Instead, a special meeting of the Consistory was held on August 9, 2006, to discuss: 1) Appellant's retirement at the end of December of 2006, which would give the new ministry the opportunity to start on Sunday, December 2, 2006; and 2) Appellant's retirement package approved by the Consistory totaling $20,968.84. However, before Appellant's retirement plans became effective, the members of Appellee's congregation who opposed Appellant took control of the Consistory and terminated Appellant as pastor on August 28, 2006.[3]

¶ 4 Appellant filed a two-count complaint sounding in breach of contract and bad faith against Appellee seeking damages in the amount of $77,095.08. This was met by a preliminary objection by Appellee claiming that the trial court lacked subject matter jurisdiction. More specifically, Appellee argued that the trial court lacked jurisdiction under the Free Exercise Clause of the First Amendment of the United States Constitution as the subject matter of the dispute was ecclesiastical in nature. The trial court conducted a hearing pursuant to Pa.R.C.P. 1028(c)(2) wherein Appellant, Ron Valente (president of the Consistory), and Brian Miller (Sunday school superintendent and a member of the Consistory) gave their beliefs as to the basis for the dismissal: Appellant and Valente testified that the removal was financially motivated, whereas Miller believed the termination was rooted in Appellant "damaging the spiritual welfare of the church and members were divided and membership had left, membership was dwindling." N.T. Hearing, 11/12/08, at 44–45. Thereafter, the trial court entered an order sustaining Appellee's preliminary objection because it lacked subject matter jurisdiction. *See* Trial court opinion, 3/3/09, at 9 ("The relationship between an organized church and its ministers is fundamentally intertwined with the church's doctrine and practice. [...] Invading this sacred relationship under the guise of contract law improperly interjects the court into questions of religious doctrine, polity, practice, and administration. It is precisely such conduct which is prohibited by the First Amendment of the United States Constitution."). This was followed by Appellant filing a timely notice of appeal claiming that the underlying dispute (breach of contract) does not turn on religious doctrine or polity but seeks the enforcement of a secular right through civil contract law. As a result, Appellant argues that the First Amendment to the United States Constitution does not bar his action for breach of a written employment contract.

¶ 5 This case arises on a preliminary objection for lack of subject matter jurisdiction; therefore, we must assume as true all allegations in Appellant's complaint. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). We can assume that the Consistory (an administrative appendage controlling Appellee's business affairs) did in fact enter into a written agreement on May 26, 2005, which provided Appellant employment protection until June 30, 2007, in exchange for his continued work as Appellee's pastor—this was subject to change "only by the unanimous consent of both parties." *See* Appellant's Complaint, 8/29/08, ¶¶ 27, 28(8). Such a change did come to pass at a meeting of the Consistory on August 9, 2006, where Appellant's retirement was

---

3. More precisely, the Consistory is the church body that brought up the topic of Appellant's termination before the church congregation for a vote. However, "[t]here was a vote by the congregation to terminate the employment contract of [Appellant]." N.T., 11/12/08, at 35.

discussed (for the end of December of 2006), as well as a monetary retirement package valued at $20,968.84 that was agreed to and executed by the Consistory and Appellant. Such facts clearly would create a contractual relationship.

¶ 6 "A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court." *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1358 (D.C.Cir.1990) (*citing Watson v. Jones,* 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871)). In *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the United States Supreme Court specified that courts may always resolve contracts governing "the manner in which churches own property, hire employees, or purchase goods." *Id.,* 443 U.S. at 606, 99 S.Ct. 3020. Even cases that rejected ministers' discrimination claims have noted that churches nonetheless "may be held liable upon their valid contracts." *Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1171 (4th Cir. 1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). "Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights [in selecting or terminating its ministers]." *Petruska v. Gannon University,* 462 F.3d 294, 310 (3rd Cir.2006), *cert. denied,* 550 U.S. 903, 127 S.Ct. 2098, 167 L.Ed.2d 813 (2007).

¶ 7 Appellee seeks to distinguish these cases on the ground that "[t]he resolution of this [contractual] issue necessarily requires the court to inquire into matters involving church polity, doctrine and administration, which is prohibited" by the First Amendment of the United States Constitution. *See* Appellee's brief, at 6.

¶ 8 The First Amendment does not exempt religious institutions from all statutes that regulate employment. For example, the First Amendment does not exempt religious institutions from laws that regulate the minimum wage or the use of child labor, even though both involve employment relationships. *See Employment Div. v. Smith,* 494 U.S. 872, 888, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (minimum wage); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (child labor). However, the First Amendment protects a church's right to hire, fire, promote, and assign duties to its ministers as it sees fit not because churches are exempt from all employment regulations (for they are not) but rather because judicial review of those particular employment actions could interfere with rights guaranteed by the First Amendment. *Elvig v. Calvin Presbyterian Church,* 397 F.3d 790, 792 (9th Cir.2005).

¶ 9 The lead case establishing the contours of the "ministerial exception" is *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.1972). On this point, the *McClure* court wrote:

The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church.

*Id.,* 460 F.2d at 558–59. Similarly, the Ninth Circuit Court of Appeals wrote in

*Bollard v. California Province of the Society of Jesus,* 196 F.3d 940 (9th Cir.1999):

A church's selection of its own clergy is [a] core matter of ecclesiastical governance with which the state may not constitutionally interfere. A church must retain unfettered freedom in its choice of ministers because ministers represent the church to the people. As the Fifth Circuit has written, they act as the church's "lifeblood." *McClure,* 460 F.2d at 558.

*Bollard,* 196 F.3d at 945. Furthermore, as one chronicles decisions of other circuit courts following *McClure,* in which a church's decision to hire, to fire, and to prescribe the duties of its ministers was upheld as constitutionally protected, we find those cases, and their holdings, to be as follows: *Alicea–Hernandez v. Catholic Bishop of Chicago,* 320 F.3d 698 (7th Cir. 2003) (church spokesperson, acting as a "minister" within meaning of exception, complained of having been given poor working conditions and replaced by a less-qualified male; church's actions held constitutionally protected); *Gellington v. Christian Methodist Episcopal Church,* 203 F.3d 1299 (11th Cir.2000) (minister reassigned to less desirable church and forced to resign; church's actions held constitutionally protected); *Combs v. Central Texas Annual Conference of United Methodist Church,* 173 F.3d 343 (5th Cir.1999) (church's decision to terminate minister held constitutionally protected); *EEOC v. Catholic University of America,* 83 F.3d 455 (D.C.Cir.1996) (nun, acting as a "minister" within meaning of exception, denied tenure in Department of Canon Law; church's decision held constitutionally protected); *Young v. Northern Ill. Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994) (church's decision to deny promotion and discharge probationary minister held constitutionally protected); *Rayburn v. General Conference of Sev-* *enth–Day Adventists,* 772 F.2d 1164 (4th Cir.1985) (church's denial of pastoral position to applicant held constitutionally protected); *McClure, supra* (female minister received lower salary and fewer benefits than male ministers and ultimately terminated; church's actions held constitutionally protected).

¶ 10 Our examination of the contractual agreement between Appellee (*via* the Consistory) and Appellant is consistent with the First Amendment and the "ministerial exception," the latter of which is subject to inquiry under the "neutral principles approach." We are not persuaded to hold otherwise based upon Appellee's argument that adherence to the "deference rule" condones the vote of the Consistory to terminate Appellant's contract. To elucidate, the United States Supreme Court in *Watson v. Jones,* 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871), defined what has come to be known as the "deference rule;" namely:

[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them.

*Id.,* 80 U.S. at 727. Nonetheless, the Pennsylvania Supreme Court has observed on this exact point:

*All disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes as to the meaning of agreements on* wills, trusts, *contracts,* and property ownership. *These disputes are questions of civil law and are not predicated on any religious doctrine. While it is true that parties may agree to settle their disputes according to their own*

*agreed fashion, the question of what they agreed to, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts.* From this consideration has evolved what is called the "neutral principles approach" delineated in *Presbyterian Church in the United States v. Blue Hull Memorial Church*, 393 U.S. 440[, 449], 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)[ ], where the rule was carefully announced.

Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is owed. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution of civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate property disputes, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *Abington School District v.*

*Schempp*, 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844] (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.

*The Presbytery of Beaver–Butler of the United Presbyterian Church in the United States of America v. Middlesex Presbyterian Church*, 507 Pa. 255, 261–62, 489 A.2d 1317, 1320–21 (1985) (Pennsylvania adopted this neutral view).

■ ¶ 11 It is these principles of deference and neutrality that compete in the present case. Appellee's position is premised upon the principle of deference, whereby it, or more particularly, the Consistory, was the final ecclesiastical tribunal, and, hence, its decision is not subject to inquiry. Contrarily, Appellant asserts that he and Appellee's Consistory subscribed to an employment agreement binding both sides, and he submits that under neutral principles, the question is not doctrinal but is a civil question of contract.

■ ¶ 12 The trial court opted to accept the question as one of deference and assigned the issue of dismissal to the Appellee's Consistory. *See* Trial court opinion, 3/3/09, at 7 ("[W]hen the civil rights of a contract implicate ecclesiastical questions, the civil court must try the civil rights with proper deference to accepting ecclesiastical decisions as binding. Thus, in resolving the contract claim, I must accept the [Appellee's] claim that [Appellant's] removal as church leader [by Appellee's Consistory] was justified. This finding predetermines the litigation as [Appellant's] breach, as found by the Appellee as an ecclesiastical decision], precludes a civil contractual claim brought by him.").[4] We find that the trial court's

4. We take exception to the trial court's presumption of facts in favor of Appellee (dismissal being ecclesiastically based) at this preliminary objection stage of the case. We

actions were premature and went too far, especially given the presence of conflicting accounts in the record as to the basis for the termination of Appellant's employment. *See* note 4, *supra.* Indeed, the trial court seemed to have mandated deference simply because the Consistory participated in the dismissal of Appellant. *See* N.T., 11/12/08, at 35–36. The trial court would have been accurate if the issue was doctrinal, but this case initially turns upon whether a contract existed at all and not the predicate for the termination; an issue that requires no doctrinal exegesis. In order for a court to find that a contract exists there must be proof of an offer, acceptance, and consideration. *Hatbob v. Brown,* 394 Pa.Super. 234, 575 A.2d 607, 613 (1990).

¶ 13 Herein, when Appellee curtailed Appellant's pastoral services in advance of the terms of the written contract, Appellant filed a complaint seeking only money damages. Appellee countered with a preliminary objection for lack of subject jurisdiction. The United States Court of Appeals for the District of Columbia has stated in a similar, albeit not identical, context:

> *We find that [A]ppellant[, who was a minister employed by Appellee United Methodist Church,] should be allowed to demonstrate that he can prove his case [charging Appellee with breaching their oral promise to give him a more suitable congregation at the earliest possible time and never making good on that promise] without resorting to impermissible avenues of discovery or remedies.* As a theoretical matter, the issue of breach of contract can be adduced by a fairly direct inquiry into whether [A]ppellant's superintendent promised him a more suitable congregation, whether [A]ppellant gave consideration in exchange for that promise, and whether such congregations became available but were not offered to [Appellant] Pastor Minker. Similarly, [Appellant's] injury can be remedied without court oversight. *Money damages alone would suffice since [Appellant] already has a new pastorship. Maintaining a suit, by itself will not necessarily create an excessive entanglement. Furthermore, as the remedy would be limited to the award of money damages, we see no potential for distortion of church appointment decisions from requiring that the [Appellee] Church not make empty, misleading promises to its clergy.*
>
> *It could turn out that in attempting to prove his case, [A]ppellant will be forced to inquire into matters of ecclesiastical policy even as to his contract claim. Of course, in that situation, a court may grant summary judgment on the ground that [A]ppellant has not proved his case and pursing the matter further would create an excessive entanglement with religion.* On the

---

must view as true all allegations in Appellant's complaint, wherein there is no mention that his dismissal was ecclesiastically based. *See Jenkins; Connor, supra.* Even Appellee's termination letter dated August 28, 2006, makes no mention of the basis for Appellant's removal as pastor. *See* Exhibit "E" attached to Appellant's complaint. Albeit we must accept findings of fact by the trial court, when supported in the record, no such deference is mandated for conclusions of law, and we are at liberty to review such conclusions. *See Bea-*

*ver–Butler,* at 266–67, 489 A.2d at 1323. Moreover, Appellee's allegation that Appellant was terminated because of a conflict related to his spiritual ministry was denied in Appellant's answer to Appellee's preliminary objection. *See* "Answer of [Appellant] to Petition of [Appellee] to Dismiss of [Appellant's] Complaint," ¶¶ 8, 9. This genuine issue of material fact was not decided by the trial court. Rather, this issue was left open with the trial court's adoption of the deference rule in resolving this case in favor of Appellee.

other hand, it may turn out that the potentially mischievous aspects of [Appellant's] claim are not contested by the [Appellee] or are subject to entirely neutral methods of proof. The speculative nature of our discussion here demonstrates why it is premature to foreclose [A]ppellant's contract claim. Once evidence is offered, the district court will be in a better position to control the case so as to protect against any impermissible entanglements. ***Thus, while the [F]irst [A]mendment forecloses any inquiry into the [Appellee's] assessment of [Appellant's] suitability for a pastorship, even for the purpose of showing it to be pretextual, it does not prevent the district court from determining whether the contract alleged by [Appellant] in fact exists.*** *Catholic High School Ass'n v. Culvert*, 753 F.2d 1161, 1168 (2d Cir.1985) ( [F]irst [A]mendment prohibition of state board's ability to inquire into nature of religious motives does not preclude it from asserting jurisdiction). ***For this reason, we find that [A]ppellant's oral contract claim cannot be totally foreclosed on a motion to dismiss.***

*Minker*, 894 F.2d at 1359–60 (emphasis added).

¶ 14 Consistent with the rationale espoused by *Minker*, we find that Appellant should be afforded the opportunity to demonstrate that he can prove his case without resorting to impermissible avenues of discovery or remedies. *Cf. Rweyemamu v. Cote*, 520 F.3d 198, 207 (2nd Cir.2008) ("[A]though its name [ministerial exception] might imply an absolute exception, it is not always a complete barrier to suit; for example, a case may proceed if it involves a limited inquiry that 'combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters.' *Bollard*, [*supra*,] 196 F.3d [at]

950[...].").   Notwithstanding, a hearing was conducted pursuant to Pa.R.C.P. 1028, albeit rather truncated, but, more importantly, did not afford Appellant the opportunity to prove that excessive entanglement into church matters need not occur to prove his breach of contract claim. On remand, if Appellant is able to prove such a proposition, application of state law to Appellant's contract claim would not violate the Free Exercise Clause. *See Petruska*, 462 F.3d at 310. If the facts prove to be otherwise, a motion for summary judgment may be granted in favor of Appellee. *See Minker, supra.* Accordingly, we reverse and remand for proceedings consistent with this Opinion.

¶ 15 Order reversed.   Case remanded. Jurisdiction relinquished.