Rabbi Bonnie LEAVY, Plaintiff,

v.

CONGREGATION BETH SHALOM and
Sioux City Jewish Community Board
f/k/a Jewish Federation of Sioux City,
Defendants.

No. 5:05–cv–04086.

United States District Court,
N.D. Iowa,
Western Division.

May 24, 2007.

Daniel B. Shuck, Jeana L. Goosmann, Sioux City, IA, for Plaintiff.

Paul D. Lundberg, Lundberg Law Firm, Sioux City, IA, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### GRITZNER, District Judge.

This matter comes before the Court on the motion of Defendants Congregation Beth Shalom (the Congregation) and the Sioux City Jewish Community Board for summary judgment. Plaintiff Rabbi Bonnie Leavy is represented by Daniel Shuck and Jeana Goosmann. Defendants are represented by Paul Lundberg. The Court has determined no hearing is necessary; therefore, the case is fully submitted and ready for ruling.

### SUMMARY OF MATERIAL FACTS[1]

Rabbi Leavy currently resides in Bethel Park, Pennsylvania. Congregation Beth Shalom and the Sioux City Jewish Community Board are religious organizations operating in Sioux City, Iowa. Rabbi Leavy served as the Congregation's religious leader or rabbi pursuant to two employment contracts. The first was signed July 3, 2002, for a term of two years. In May 2004, the parties entered into a second contract, at issue in the present case. The Board of Congregation Beth Shalom supervised Rabbi Leavy. The chairman of the board was Brent Rosenthal.[2]

The May 2004 contract provided that Rabbi Leavy would serve as rabbi to Congregation Beth Shalom for a period of three years ending August 14, 2007.[3] Paragraph 11 provides that the agreement may be terminated by the Congregation for gross misconduct or an ongoing inability to perform the duties described in the agreement. According to the agreement, Rabbi Leavy's duties included the following: leading religious services, serving as principal and teacher in the Hebrew school, Bar/Bat Mitzvah training, visiting ill or confined congregants, satisfying pastoral needs of members, maintaining regular office hours, writing newsletter articles, and representing the Jewish community in a positive light.

Rabbi Leavy claims she suffered a physical disability related to a broken foot, which limited her ability to stand, walk, and move. She contends she outlined a set of accommodations that would permit

1. In resisting the pending motion, Rabbi Leavy failed to respond to Defendants' statement of material facts as required by Local Rule 56.1(b)(2) (the rule is the same in both the northern and southern districts of Iowa). Rabbi Leavy instead "denied" the various paragraphs of the motion itself and submitted her own statement of material facts. Defendants did not reply to Rabbi Leavy's statement of material facts per Local Rule 56.1(d). The provisions of this Local Rule are not a mere technical hurdle for the parties but are an essential procedure in which the persons most familiar with the case and best suited to identify essential issues and record evidence are required to do so, rather than requiring the Court to scour the record. *See Northwest Bank and Trust Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 724–25 (8th Cir.2003). However, given the narrow legal issue presented in the pending motion, as discussed more fully below, the Court finds that any differences between the statements of facts are minimal and in any event not material.

2. Rabbi Leavy's employment agreement was with the Congregation, but Defendants explain that the Congregation and the Sioux City Jewish Community Board are governed by a joint governing board.

3. Rabbi Leavy claims many of the terms and conditions of her employment were discussed during the course of interviews during the spring and summer of 2002, and the Defendants voluntarily opted to reduce these discussions to a written employment contract, using language of their choosing. She further claims she did not review the contract with an attorney before signing it.

her to work, and, despite her disability, she continued to perform her job duties in a manner that met Defendants' expectations.

Michael Potash, president of the Congregation, authored a memo outlining areas of the Congregation's dissatisfaction with Rabbi Leavy's performance, including communication with congregants, office hours, pastoral care, religious services, and secular community activities. Congregants were specifically concerned about Rabbi Leavy's participation in Minyan (communal prayer), her lack of visits to ill or infirm congregants, and her lack of availability to congregants. In December 2004, the Congregation gave Rabbi Leavy a written memorandum of concerns regarding her job performance and provided specific instructions for the timeliness of returning phone calls and number of visits to ill or confined congregants. Rabbi Leavy responded with a written memorandum, stating she had posted her office hours and made every reasonable effort to return congregants' phone calls and messages. She also stated that the visitation requirements outlined in the memo were not reasonable, given her foot injury. She requested that Al Shilling take her in a wheelchair to visit nursing homes and hospitals each Wednesday morning. Defendants claim Rabbi Leavy took advantage of alternate transportation once and then refused to continue with the accommodation.

In February 2005, the Defendants' board of directors determined that Rabbi Leavy's performance had not improved since the December 2004 memo, and the board voted to terminate her employment. Defendants contend the board of directors so acted after determining that Rabbi Leavy failed to provide pastoral leadership for the Congregation consistent with the rabbinic nature of her employment. They claim Rabbi Leavy failed to maintain rea-sonable and predictable office hours and was not accessible by phone for congregants needing her pastoral services. Defendants further assert she refused to properly respond to family needs regarding funerals, failed to provide pastoral care of congregants in nursing homes and hospitals, complained about the Congregation to non-members, and complained about individual congregants to other congregants. In sum, Defendants claim Rabbi Leavy failed to conform to the duties expected of her as pastoral leader of the Congregation.

Defendants point to the Guidelines for Rabbinical–Congregational Relationships, published by the Union of American Hebrew Congregations and the Central Conference of American Rabbis, which states, "Sacred Jewish values underlie the partnership between Rabbi and congregation," "[a] congregation is best served when its lay and rabbinic leadership consider themselves partners in carrying on the scared functions of the Synagogue," and "the Rabbi is the congregation's chosen spiritual leader, called to minister to the religious, educational, pastoral, and communal needs of the membership."

Rabbi Leavy contends she performed her job adequately at all times, despite her foot injury disability. She brought this suit claiming she was discharged because of her disability and in violation of her employment agreement.

Rabbi Leavy alleges claims of disability discrimination under state and federal law and breach of contract. Jurisdiction is proper as Rabbi Leavy's discrimination claim arises under federal law, the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Jurisdiction for claims under Iowa Code § 216.6(1)(a) and breach of contract is premised on the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Defendants admit Rabbi Leavy has exhausted her administrative remedies. Defendants assert that Rabbi Leavy was not disabled within the meaning of the ADA, and she refused reasonable accommodations for her alleged physical impairment. Defendants further assert that personnel decisions affecting clergy are protected religious activity under the First Amendment to the United States Constitution.[4]

## APPLICABLE LAW AND DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 permits parties against whom claims are brought to move for summary judgment. Fed.R.Civ.P. 56(b). That rule provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* R. 56(c). The United States Supreme Court has explained that " '[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Scott v. Harris,* — U.S. ——, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted and alteration by the *Scott* Court)). In other words, " 'the mere existence of *some* alleged factual dispute between the parties will not defeat' " a properly supported motion for summary judgment; instead, there must be " 'no *genuine* issue of *material* fact.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphases by the *Anderson* Court)).

However, even where there are competing narratives, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Two or more sides of a factual dispute each supported by evidence identified by the parties metamorphose a generic factual dispute into a genuine one. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (to reject a motion for summary judgment, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party"), 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' ")). That is, the demonstration "that there is some metaphysical doubt as to the material facts" is not sufficient. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348.

Of course, locating a genuine factual dispute that can be resolved in favor of the nonmoving party does not automatically render the entry of summary judgment inappropriate: the dispute must also be about a fact that is material. A genuine dispute about a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at

---

4. Defendants have answered interrogatories in this case pursuant to a general objection that compelling this religious organization to respond to questions concerning the basis for Rabbi Leavy's termination violates the Free Exercise Clause of the First Amendment.

248, 106 S.Ct. 2505. Conversely, genuine disputes about "irrelevant or unnecessary" facts are not sufficient. *Id.* at 248, 106 S.Ct. 2505. As a result, if the evidence supporting a claim "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citing *Cities Serv.,* 391 U.S. at 290, 88 S.Ct. 1575; *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam)); *see also Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (in the face of a properly supported motion, requiring a nonmoving party to "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of pro[of]"). Applicable substantive law governs which facts are critical and which are irrelevant. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when deciding if a material factual dispute exists, a court must "view[ ] the evidence through the prism of the controlling legal standard").

Procedurally, the moving party must inform the Court of the basis for its motion by pointing to places in the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The resisting party must then go beyond the pleadings and present " 'specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (quoting Fed. R.Civ.P. 56(e); *accord Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 329, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) ("To prevail on a ... motion for summary judgment—as opposed to a motion to dismiss—... mere allegations ... are insufficient."); *Behrens v. Pelletier,* 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (holding that when considering a motion for summary judgment, "the plaintiff can no longer rest on the pleadings and the court looks to the evidence before it (in the light most favorable to the plaintiff)" (citation omitted)); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that "[i]n, ... response to a summary judgment motion ... [a] plaintiff can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' " (quoting Fed. R.Civ.P. 56(e)); *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (a properly supported motion must be resisted by a party's "own affidavits, or by the depositions, answers to interrogatories, and admissions on file" to "designate specific facts showing that there is a genuine issue for trial" (quotation marks omitted)). If a party bears the burden of proof at trial, summary judgment is appropriate against that party if it "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *accord Nebraska v. Wyoming,* 507 U.S. at 590, 113 S.Ct. 1689; *Lujan v. Nat'l Wildlife Feder.,* 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). There is no burden upon "the moving party to *negate* the elements of the nonmoving party's case;" instead, it is inherent upon the nonmoving party to designate specific facts demonstrating the need for a trial. *Lujan,* 497 U.S. at 885, 110 S.Ct. 3177. If the nonmoving party fails, "[t]he moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *accord Nat'l Wildlife Feder.,* 497 U.S. at 884, 110 S.Ct. 3177.

Throughout this process, the Court must view the record and reasonable inferences derivable from the record in a light favorable to the nonmoving party, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398

U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88, 106 S.Ct. 1348, presume the nonmoving party's version of a disputed issue is the correct one, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 339, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Hunt v. Cromartie*, 526 U.S. 541, 551, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Bragdon v. Abbott*, 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130, but steer clear of performing jury functions like making credibility determinations, weighing the evidence, and "drawing ... legitimate inferences from the facts," *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *see also Hunt*, 526 U.S. at 552, 119 S.Ct. 1545 (error for district court to resolve disputed fact). But if " 'it is quite clear what the truth is,' " summary judgment may be granted, for " 'the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)); *Crawford–El*, 523 U.S. at 600, 118 S.Ct. 1584 (noting that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial"); *Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548 (stating that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and ... it should be interpreted in a way that allows it to accomplish this purpose"). *Cf. Clinton v. Jones*, 520 U.S. 681, 708, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (suggesting Rule 56 serves as a deterrent to the initiation of "frivolous and vexatious litigation").

Informed by these standards, the Court turns to the parties' arguments.

## II. DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT

■ The Americans With Disabilities Act (ADA) prohibits a covered employer from discriminating against a disabled individual regarding the terms, conditions, and privileges of employment because of that individual's disability. 42 U.S.C. § 12112(a) (2006). "The core of every ADA disability definition involves a physical or mental impairment that substantially limits one or more major life activity." *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir.2007) (citing 42 U.S.C. § 12102(2)). The claimed disability appears to be related to recovery from foot surgery necessitated by a fall Rabbi Leavy sustained while up one night caring for her cat. Defendants admit that after her surgery Rabbi Leavy used crutches and a cane to assist her mobility.

■ The pending motion exclusively concerns whether the First Amendment prohibits the Court from entertaining Rabbi Leavy's claims. Neither party addresses the basic framework of an ADA claim,[5] nor

---

5. The basic framework of an ADA claim was recently summarized by the Eighth Circuit as follows:

    In ADA cases, a plaintiff may survive a defendant's summary judgment motion in one of two ways, presenting either direct or inferential evidence of discrimination. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004) (citations and quotations omitted). Direct evidence in this context is not the converse of circumstantial evidence. *Id.* "Rather, direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Id.* (internal quotation omitted).

do they analyze whether Rabbi Leavy's alleged disability qualifies as such under the ADA standard. *See id.* (describing the " 'demanding standard for qualifying as disabled' "). Accordingly, the Court proceeds to consider the application of the ADA to Defendants Congregation Beth Shalom and the Sioux City Jewish Community Board.

The ADA contains two provisions specific to religious entities: "a religious corporation, association, educational institution, or society [is not prohibited] from giving preference in employment to individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities ... [and] a religious organization may require that all applicants and employees conform to the religious tenets of such organization." 42 U.S.C. § 12113(c). Thus a religious organization may give preference in employment to members of its own denomination and may require that employees conform to the organization's religious doctrines. Title VII similarly excepts religious institutions "with respect to the employment of individuals of a particular religion" to carry on the duties of the religious organization. 42 U.S.C. § 2000e–1(a).[6]

■ Neither Title VII nor the ADA specifically exempt discrimination claims made by clergy. Thus, while both statutes permit "religious institutions to make employment decisions based on religious preference ... [w]ith respect to issues of race, sex and national origin, [ ] the text of Title VII treats an employment dispute between a minister and his or her church like any other employment dispute." *Dolquist v. Heartland Presbytery,* 342 F.Supp.2d 996, 1000 & n. 6 (D.Kan.2004); *see also Rayburn v. Gen. Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1166 (4th Cir. 1985) (same).

This body of law, however, may grant a religious leader litigant a false sense of security. Though the statute itself does not exempt claims by clergy, courts have found that certain employment discrimination claims by clergy are precluded by the First Amendment.

---

However, if the Plaintiff lacks direct evidence of discrimination, she must avoid summary judgment by creating the requisite inference of unlawful discrimination under the *McDonnell Douglas* framework. *Id.* Under this analysis, the employee bears the burden of establishing a prima facie case of discrimination. *Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1044–45 (8th Cir.2005). The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's actions. *Id.* If the employer articulates such a reason, the burden returns to the employee to show the employer's justification is a pretext. *Id.* To establish a prima facie case of discrimination under the ADA, a plaintiff must show she (1) has an ADA-qualifying disability; (2) is qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (3) suffered adverse employment action.

6. Rabbi Leavy has not stated a claim for discrimination under Title VII, though she refers in her brief to the applicability of Title VII to the present action. It is assumed Rabbi Leavy refers to Title VII inasmuch as Title VII jurisprudence has traditionally informed analysis under other anti-discrimination statutes, including the ADA. *See, e.g., Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 157 (3rd Cir. 1995) ("In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well.").

*Libel v. Adventure Lands of America, Inc.,* 482 F.3d 1028 (8th Cir.2007); *see also id.* at n. 5 ("We analyze disability discrimination claims under ICRA within the same framework as claims brought under the ADA").

Defendants direct the Court to *Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360 (8th Cir.1991). In *Scharon,* the plaintiff was an ordained priest who worked at a church-affiliated hospital as a chaplain. *Id.* at 361. The hospital claimed it terminated her employment because her supervisor, also an ordained priest, "believed she was violating several canonical laws." *Id.* The plaintiff alleged her termination was the result of age and sex discrimination. *Id.*

■ The court applied the analysis set forth by the Supreme Court in *N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Under that analysis, the court must determine (1) "whether the application of the [ ][ADA] to the present case 'would give rise to serious constitutional questions,'" (2) "whether the [ ][ADA] appl[ies] to the case at hand," and (3) "whether the[ ] statute[ ] constitutionally can be applied to the present facts." *Scharon,* 929 F.2d at 361–62 (quoting *Catholic Bishop,* 440 U.S. at 499, 501, 504, 99 S.Ct. 1313).

In *Catholic Bishop,* the Supreme Court had to determine whether the National Labor Relations Board could exercise jurisdiction over lay faculty members of a church-affiliated school. *Catholic Bishop,* 440 U.S. at 491, 99 S.Ct. 1313. In determining whether the N.L.R.B.'s exercise of jurisdiction "would give rise to serious constitutional questions," the Court first noted "the critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Id.* at 501, 99 S.Ct. 1313. The N.L.R.B. argued that it would resolve only factual issues, such as determining whether the school's action was motivated by anti-union animus, and that such inquiries would not amount to excessive religious entanglement. *Id.* at 502, 99 S.Ct. 1313. The Court held that "at this stage of our consideration we are not compelled to determine whether the entanglement is ex-

cessive as we would were we considering the constitutional issue." *Id.* The Court instead made "a narrow inquiry whether the exercise of the Board's jurisdiction presents a significant risk that the First Amendment will be infringed." *Id.* ·

Accordingly, the Court must make a primary inquiry as to whether the adjudication of Rabbi Leavy's ADA claim presents a significant risk of infringing the First Amendment. Defendants have not discussed this issue, focusing instead on the ultimate outcome in *Scharon.* Rabbi Leavy appears to concede that serious constitutional questions are raised. (Pl.'s Br. 7 ("Defendants cannot seriously suggest that the claims regarding discrimination do not raise serious constitutional questions.")) In *Scharon,* the Eighth Circuit found that the plaintiff's claims "[w]ithout a doubt" raise serious constitutional questions. *Scharon,* 929 F.2d at 361. The Court is compelled to find that Rabbi Leavy's claims are sufficiently analogous to the claims raised by the plaintiff in *Scharon* that serious constitutional questions are presented.

The second consideration is whether the ADA applies to the present case, because "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *Catholic Bishop,* 440 U.S. at 500, 99 S.Ct. 1313. In *Scharon,* the court assumed for purposes of analysis that the ADEA applied to the employment relationship. *Scharon,* 929 F.2d at 361. The court noted that Title VII clearly applied, based on the Fourth Circuit's opinion in *Rayburn,* but stated the application of the ADEA was uncertain. *Id.* at n. 2 (citing *Rayburn,* 772 F.2d 1164). Although the ADEA and Title VII definitions of employer were identical, the ADEA lacked legislative history indicating Congressional intent to apply the ADEA to religious in-

stitutions. *Id.* Ultimately, the court determined that it need not decide the question: if the ADEA did not apply, the plaintiff's claims were foreclosed; if it did apply, the court determined the ADEA analysis would track with the Title VII analysis, wherein the court ultimately determined that the First Amendment foreclosed application of the statute to the pending claims. *Id.* As the following analysis demonstrates, this Court may make the same assumption here. In any event, the parties do not contest the application of the ADA to the pending claims.

■ The third inquiry under *Catholic Bishop* is whether the ADA can be constitutionally applied to the case at bar.[7] *Id.* at 361–62. For this final prong of the analysis, the Court applied another three-part test set out by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). "For a statute to withstand scrutiny under the Establishment Clause of the First Amendment, it first 'must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion … [and third] the statute must not foster "an excessive government entanglement with religion." ' " *Scharon,* 929 F.2d at 362 (quoting *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105 (citations omitted)) (alterations in original).

*Scharon* and numerous other decisions have established that the employment discrimination statutes do not pose a problem for the first or second prongs of the *Lemon* test. *See, e.g., id.* at 362 ("It is clear that both the ADEA and Title VII have a secular purpose, and that neither has the principal or primary effect of advancing or inhibiting religion.") (citing *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 335–39, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (holding that Title VII's exemption for religious organizations discriminating on the basis of religion meets the first two parts of the *Lemon* test)); and *Rayburn,* 772 F.2d at 1170 n. 6 ("There is no question that Title VII meets the first two of these tests."). Accordingly, the crux of the pending motion, as to the ADA claims, turns on whether applying the ADA to the present case "would require excessive government entanglement with religion."

■ The level of government entanglement is determined by "examin[ing] the character and purposes of the institutions" affected, the nature of the governmental aid or imposition, and "the resulting relationship between the government and the religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105. A definitive construct of "entanglement" is elusive, but "courts have found an unconstitutional entanglement with religion in situations where a 'protracted legal process pit[s] church and state as adversaries,' *Rayburn,* 772 F.2d at 1171, and where the Government is placed in a position of choosing among 'competing religious visions.' *Geary [v. Visitation of Blessed Virgin Mary Parish School,* 7 F.3d 324, 330 (3rd. Cir.1993)]." *E.E.O.C. v. Catholic Univ. of America,* 83 F.3d 455, 465 (D.C.Cir.1996).

The *Scharon* court looked at the nature of the institution and the nature of the plaintiff's employment and determined that the church-affiliated hospital had a substantial religious character and the plaintiff's employment as chaplain was "clergy." *Scharon,* 929 F.2d at 362–63. Although the hospital provided health care services that were secular and a portion of

---

**7.** Subsequent cases have referred to the *Catholic Bishop* test in two parts, essentially combining the second and third steps as they were delineated in *Scharon. See, e.g., Weissman v. Congregation Shaare Emeth,* 38 F.3d 1038 (8th Cir.1994).

the plaintiff's job could be characterized as secular, the court determined that the hospital's role as plaintiffs employer was unquestionably a religious role. *Id.; see also Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. 1313 (describing "the critical and unique role of the teacher in fulfilling the [religious] mission of a church-operated school"); *cf. Volunteers of America–Minn. Bar None Boys Ranch v. N.L.R.B.*, 752 F.2d 345, 348 (8th Cir.1985) (exercise of NLRB jurisdiction did not infringe First Amendment where the church-operated ranch employed no ministers, chose staff without regard to religious beliefs or affiliations, and did not conduct religious classes or services). Further, the chaplain job description required ordination by a religious faith group and assigned seventy percent of the duties of the position to religious and ministerial work. *Scharon*, 929 F.2d at 362–63.

In addition, the plaintiff argued that excessive entanglement could be avoided at the pretext stage of the discrimination analysis "because the defendants' claims that religious issues were the basis for her termination are merely a pretext for the actual motive behind her dismissal. Therefore, she asserts, government involvement with religion can be avoided by focusing solely on the issues of age and sex discrimination." *Id.* at 363. The court rejected the plaintiff's contentions, holding that,

> Personnel decisions by church-affiliated institutions affecting clergy are per se religious matters and cannot be reviewed by civil courts, for to review such decisions would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made. This is precisely the kind of judicial second-guessing of decision-making

by religious organizations that the Free Exercise Clause forbids. *Id.*

The Supreme Court has noted that when the resolution of an issue "will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators ... [I]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *Catholic Bishop*, 440 U.S. at 502, 99 S.Ct. 1313.

■ The Court has carefully considered the posture of the present case against this growing body of law. While at first glance this case presents not as a controversy over the nature and quality of Rabbi Leavy's performance of her assigned tasks, but rather whether she was performing the tasks at all, the analysis quickly implicates whether the performance she was providing could meet her religious obligations. The issue is further complicated by the record of complaints regarding communication with congregants, pastoral care, religious services, and complaints offered by Rabbi Leavy within and without the confines of the congregation. From this type of record, there understandably arises a reluctance of courts not only to avoid the ultimate entanglement but to avoid the essential inquiry.

Cases from other circuits similarly reflect a judicial hesitancy to even begin to parse the reasons—whether apparently legitimate or possibly pretextual—for a religious organization's choice of clergy. The District of Columbia Circuit held that a minister's age discrimination claim was properly dismissed because "the first amendment prohibits the government from regulating internal church decisions about the promotion of pastors, because churches have broad discretion in determining who

may speak for the church." *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1355 (D.C.Cir.1990). The minister had asserted that since there was no church policy or doctrine in favor of age discrimination, there was no First Amendment implication in having a secular court decide his claim. *Id.* at 1356. The court held that it need not wade into the nuances of church policy, as determination of the church leader "is *per se* a religious matter. We cannot imagine an area of inquiry less suited to a temporal court." *Id.* at 1356–57 (internal citations omitted).

The Fourth Circuit affirmed a summary judgment ruling in favor of a church against a pastor who charged racial and sexual discrimination in the church's hiring process. *Rayburn*, 772 F.2d at 1165. The court found the constitutional questions mandated refrain from inquiry into clergy selection. "The right to choose ministers without government restriction underlies the well-being of religious community, [ ] for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines." *Id.* at 1167–68. The court held that any governmental attempt "to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights." *Id.* at 1168.

The Fifth Circuit found that the Free Exercise Clause precluded the court's consideration of a minister's Title VII sex discrimination claim in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.1972). Calling the relationship between congregation and clergy the "lifeblood" of the church, the court determined that matters affecting that relationship "of prime ecclesiastical concern" and thus outside the purview of the secular courts. *Id.* at 558–59; *see also id.* at 560–61 ("Congress did not intend, through the nonspecific wording of the applicable provisions of Title VII, to regulate the employment relationship between church and minister").

The Seventh Circuit held that "the overwhelming weight of precedent going back over a century" precluded the court from intervening in a minister's race discrimination, sex discrimination and retaliation claims. *Young v. N. Ill. Conference of United Methodist Church*, 21 F.3d 184, 187 (7th Cir.1994). The court agreed with the district court that the Supreme Court's decision in *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), foreclosed any such inquiry, as it stands for the proposition that a church's selection of its hierarchy is "primarily an ecclesiastical matter" that is the exclusive province of the church. *Young*, 21 F.3d at 186. The court ultimately determined that the First Amendment prohibits civil court review of church procedures regarding clergy employment decisions. *Id.* at 187 (stating that such a review of clergy employment or other ecclesiastical decisions of church tribunals "are in themselves an 'extensive inquiry' into religious law and practice, and hence forbidden").

Finally, Defendants direct the Court to *Werft v. Desert Southwest Annual Conference of the United Methodist Church*, 377 F.3d 1099 (9th Cir.2004). As one of the more recent federal circuit opinions dealing with anti-discrimination law as applied to the clergy-congregation relationship, *Werft* continued the hands-off stance that previous courts had found required by the First Amendment. A minister alleged several physical and mental conditions but claimed he was able to perform his ministerial duties with slight accommodations. *Id.* at 1100. He sued the church pursuant to the ADA, asserting the church failed to accommodate his disability and that the failure to make reasonable accommoda-

tions forced him to resign. *Id.* (the plaintiff also asserted claims for breach of contract and violation of Title VII). The court held that it could not consider such a claim, as it "clearly fits into this long recognized category of ministerial 'personnel decisions' exempt from consideration by the civil courts," noting that the very act of decision was protected—even the reasoning behind such a decision was outside the legitimate purview of the court. *Id.* at 1102–03.

Rabbi Leavy claims there is a factual issue as to whether resolving her disability discrimination claim will excessively entangle the Court in the administration of its religious affairs. The Supreme Court has noted that a certain amount of church-state interaction is inevitable, thus not all entanglements are constitutionally impermissible: "[e]ntanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini v. Felton,* 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). The Court finds Rabbi Leavy's reliance upon *Agostini* misplaced. That case determined that a New York City Board of Education program that sent public school teachers into parochial schools did not result in excessive government entanglement with religion. *Id.* at 234–35, 117 S.Ct. 1997. The Court's concern in that case was to what extent a government aid program had the effect of advancing religion, a wholly separate constitutional concern than the personnel decisions of a congregation regarding its clergy. As the previously discussed line of cases demonstrate, it is the very inquiry into those decisions that constitutes excessive entanglement with a church's internal affairs. The Court finds nothing in *Agostini* refutes that series of holdings or commands a different result in this case.

Rabbi Leavy next urges the Court to apply the church autonomy doctrine and find that Defendants are not entitled to protection thereunder because the alleged misconduct—disability discrimination—is not a tenet of the Jewish faith. In support of her argument, she directs the Court to *Malicki v. Doe,* 814 So.2d 347 (Fla.2002), and *Bollard v. California Province of the Society of Jesus,* 196 F.3d 940 (9th Cir. 1999).

In *Malicki,* parishioners sued the church for negligent hiring and supervision related to alleged sexual assaults by clergy. *Malicki,* 814 So.2d at 352. The church asserted that resolving negligent hiring and supervision claims would "necessarily implicate[ ] church practices and doctrine." *Id.* at 360. The court found no First Amendment prohibition to the suit "because this case is not an internal church matter" and "the conduct sought to be regulated ... is not rooted in religious belief". *Id.* at 360–61.

Sexual misconduct was also at issue in *Bollard,* where a novice priest alleged that his superiors sexually harassed him during his training and study for ordination in violation of Title VII. *Bollard,* 196 F.3d at 944. The court disagreed with the district court's application of the ministerial exception and found that the plaintiff's case against the church could proceed. *Id.* In doing so, the court "acknowledged a church's choice of clergy is a core matter of ecclesiastical self-governance" and "it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions." *Id.* at 946. The court also noted, however, that vastly different concerns underlie the relationship between the church and lay employees who do not serve pastoral functions. *Id.* The court ultimately determined that the novice pastor's claim was akin to claims brought by lay personnel, because the church did not offer a religious justification for the harassment and the plaintiff did not allege any adverse personnel action. *Id.* ("this is not a case

about the Jesuit order's choice of representative, a decision to which we would simply defer without further inquiry").

Thus, Rabbi Leavy asserts, the Court must determine whether her claims are "about discipline, faith, internal organization, or ecclesiastical rule, custom or law, [ ] or whether it is a case in which we should hold religious organizations liable in civil courts for purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization." *Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir.1997) (internal quotations and citations omitted). She claims Defendants have not propounded a justification for disability discrimination rooted in religious doctrine or inherent in church administration, and therefore her claims constitute the latter type of dispute.

The Court finds the language of *Bollard* indicates Rabbi Leavy's claims are precisely the sort of claims contemplated by the ministerial exception and do not fall into the category of harassment or abuse-based claims that courts have determined to be outside the core ecclesiastical concerns implicated in clergy selection. *Malicki* and *Bollard* are inapposite because of the vastly different issues and analysis implicated by sexual harassment or sexual assault, the latter being essentially a criminal act.

The *Werft* case, decided after *Bollard*, reaffirms this distinction. The *Werft* court noted that courts have applied the ministerial exception to bar Title VII suits by clergy, before and after *Bollard*. *Werft*, 377 F.3d at 1101. The *Bollard* case, however, was allowed to proceed based on three findings: (1) the church was not "exercising its constitutionally protected prerogative to choose its ministers"; (2) the church was not "embracing the behavior at issue as a constitutionally protected religious practice;" and (3) "allowing the case to go forward did not raise any significant issues about government entangle-ment with religion under the Establishment Clause." *Id.* The Court finds no basis for those or similar findings present in this case.

This circuit has also maintained a sharp distinction between lay employees of religious organizations and employees acting in a ministerial or pastoral capacity. In *Weissman*, the Eighth Circuit determined that a temple administrator's employment was as a lay employee, as his duties were logistical and administrative in nature, he was not a member of the clergy, and he did not participate in spiritual matters. *Weissman*, 38 F.3d at 1040. The court disagreed with the district court's conclusion that the First Amendment prohibited consideration of the administrator's ADEA claim, finding the *Catholic Bishop* test should be applied to employment discrimination claims on a case-by-case basis due to the relatively minor intrusion of the discrimination statutes versus the broad regulatory scheme of the National Labor Relations Act. *Id.* at 1042–43. Ultimately, the court determined that lay employees may proceed with discrimination claims as long as they do not challenge the validity of the religious reason propounded for their discharge. *Id.; see also id.* at 1044 ("there [also] may be cases involving lay employees in which the relationship between the employee and the employer is so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the First Amendment"). However, "cases in which clergy sue a religious employer are inapposite to lay employees of religious institutions because such cases deal 'with the pervasively religious relationship between a member of the clergy and his [or her] religious employer.'" *Id.* at 1044 (citing *DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2nd Cir.1993)). Support for this conclusion came also from *Scharon*, which the court characterized "as a case which stands for the proposition that 'a

spiritual employee who also perform[s] spiritual duties' cannot seek relief under the ADEA for adverse employment action by her religious employer." *Id.* at n. 6. While recognizing the exception for clergy, the court declined to extend the exception to non-clergy employees. *Id.* The temple administrator was not clergy, and his duties were overwhelmingly secular; therefore, his discrimination claim was allowed to proceed without significant risk of constitutional infringement. *Id.* at 1045.

Should the Court allow the pending claim to proceed, the application of the *McDonnell Douglas* burden-shifting analysis would eventually find Rabbi Leavy attempting to prove that the Defendants' stated reason for Levy's discharge was a pretext for unlawful discrimination. *Id.* at 1043. Defendants assert that Rabbi Leavy's employment was terminated because she "failed to provide pastoral leadership for the congregation consistent with the rabbinic nature" of her employment. They assert she did not have reasonable and predictable office hours and that she was not available by phone when congregants needed her. Further, they claim she failed to provide pastoral care to congregants in nursing homes and hospitals and complained about the congregation.

The pretext inquiry asks only if the stated reasons for the discharge are the actual reasons and does not require the Court to determine if those reasons are fair or reasonable. *Id.* at 1044. Once the ADA claim reached the pretext stage, the Court, though not bound to determine if Rabbi Leavy was actually performing as she or Defendants suggest, would necessarily have to inquire as to the Defendants' good-faith beliefs regarding Leavy's performance. Such an inquiry invites improper scrutiny by the Court of the Defendants' administration and expectations as a religious institution. Any such investigation presses the civil court to become ex-

cessively entangled in internal church affairs and is prohibited by the First Amendment. Accordingly, the Court must grant Defendants' motion for summary judgment as to Rabbi Leavy's disability discrimination claims.

## III. BREACH OF CONTRACT

■■■ The claim for breach of contract similarly raises the compelling question of whether religious determinations are at issue or whether this is merely a civil contract dispute defined by the terms the Defendants sought. Though the Defendants' insistence on a contract document increases the stark nature of the legal collision, the result ultimately is the same.

Rabbi Leavy relies heavily on *Minker v. Baltimore Annual Conference of United Methodist Church,* wherein the court permitted the plaintiff-pastor's breach of oral employment contract claim to survive a motion to dismiss. *Minker,* 894 F.2d at 1359. "A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court." *Id.* Rabbi Leavy emphasizes that Defendants freely chose to burden their employment relationship by the terms and conditions embodied in the agreement and also notes Defendants chose the language of the agreement, whereas she did not review the contract with an attorney before signing it.

The church in *Minker* claimed that permitting the plaintiff to prove the existence of a contract would necessarily entail the type of entanglement and intrusion prohibited by the First Amendment. *Id.* The court disagreed, stating that "the first amendment does not immunize the church from all temporal claims made against it." *Id.* at 1360. To survive a motion to dismiss, the plaintiff need only demonstrate "that *some* form of inquiry is permissible and *some* form of remedy is available." *Id.* (further noting the relief would be lim-

ited to money damages and not reinstatement).

As Defendants point out, substantial differences between *Minker* and the circumstances of the present case limit *Minker's* applicability here. The court "acknowledge[d] that the contract alleged by Minker threatens to touch the core of the rights protected by the free exercise clause." *Id.* Further, "any inquiry into the Church's reasons for asserting that Minker was not suited for a particular pastorship would constitute an excessive entanglement in its affairs." *Id.* The court's decision was limited to whether the plaintiff would be permitted to prove the existence of a contract and thus survive a motion to dismiss. Neither Rabbi Leavy nor Defendants dispute the existence of a written employment contract, and this case is presented on a motion for summary judgment, so the posture is inapposite. The *Minker* court specifically noted that the plaintiff may be forced to probe matters of church policy to prove his contract claim, and, should that occur, the court could grant summary judgment to prevent excessive religious entanglement. Y at 1360–61 ("the first amendment forecloses any inquiry into the Church's assessment of Minker's suitability for a pastorship, even for the purpose of showing it to be pretextual").

The heart of Defendants' alleged justification for terminating Rabbi Leavy's employment is the board and congregation's dissatisfaction with her level of attentiveness and general suitability for the needs of the congregation. This is precisely the sort of inquiry *Minker* held was beyond a court's ability to adjudicate under the First Amendment. Nothing in *Minker* stands for the proposition that a court may entertain breach of contract claims even if they involve excessive entanglement with religious affairs. The Court therefore finds Rabbi Leavy's reliance on *Minker* misplaced.

Rabbi Leavy's reliance on *McKelvey v. Pierce* is similarly unpersuasive. There, the plaintiff alleged contract and tort claims arising from sexual harassment during seminary training. *McKelvey v. Pierce*, 173 N.J. 26, 800 A.2d 840 (2002). The lower court granted defendants summary judgment, but the New Jersey Supreme Court held that the church autonomy doctrine cannot be applied blindly to all disputes involving church conduct. *Id.* at 851. The court stated the issue before it was akin to the very issue of existence of such a contract in *Minker,* and further stated that the underlying allegations of harassment were strikingly similar to those in *Bollard.* For the reasons already discussed above, the Court finds *McKelvey* inapplicable. *See also Werft,* 377 F.3d at 1100 n. 1 ("[b]ecause the ministerial exception is based in the First Amendment, we make no distinction between the various federal and state law claims. Just as there is a ministerial exception to Title VII, there must also be one to any federal or state cause of action that would otherwise impinge on the Church's prerogative to choose its ministers").

Rabbi Leavy further urges that the Court should entertain her breach of contract claims because Defendants made numerous secular legal references in drafting the employment agreement, including (1) health and disability insurance, (2) the Internal Revenue Code, (3) insurance coverage by the Congregation, (4) termination based upon gross misconduct, and (5) termination based on an inability to perform duties. In addition, the 2004 contract had an addendum which referred to certain statistics published by the U.S. Department of Labor regarding the calculation of Rabbi Leavy's annual compensation adjustment. Rabbi Leavy asserts that Defendants may not avail themselves of the benefit of the civil courts and legal system when drafting the agreement and hide be-

hind the First Amendment when it is Rabbi Leavy who is seeking enforcement of the terms.

The Court finds that in this respect, Rabbi Leavy argues too much. It is simply the duty of this Court to decide whether excessive entanglement is present based on the claims asserted in the Complaint. Had Rabbi Leavy brought a claim for breach of contract based on Defendants' refusal to provide the agreed-upon insurance coverage or failure to make the annual compensation adjustment, it may well be that the Court could adjudicate those claims by factual determinations that do not involve the court in internal, ecclesiastical matters. However, Defendants claim to have discharged Rabbi Leavy pursuant to misconduct and an inability to perform her duties. As the above analysis has repeatedly noted, the ability of church members to obtain clergy of their choosing is a matter of prime constitutional consideration and outside the proper inquiry of a civil court.

The parties were granted permission to file supplemental briefs providing the Court with state-law authority as to breach of contract claims by clergy. In *Pierce v. Iowa–Missouri Conference of Seventh–Day Adventists*, 534 N.W.2d 425 (Iowa 1995), the plaintiff brought suit for beach of unilateral contract of employment and various tort claims. The district court granted the church's motion for summary judgment after determining that reviewing the claims would "involve an inappropriate interpretation of church polic[y]," and the plaintiff appealed, contending there was "a secular aspect to his termination which can be reviewed by the courts." *Id.* at 426. The plaintiff had served as pastor in several churches, but the church executive committee voted to terminate his employment. *Id.* He admitted that his effectiveness as a

minister was outside the court's review but argued that he did not receive periodic performance reviews and counseling as provided by church policy. This failure to follow internal policy, he claimed, was a sufficiently separate and secular concern that the court could consider the claim. *Id.* at 427. The Iowa Supreme Court disagreed, finding that his pastoral effectiveness was the "essence" of his discharge from employment. *Id.* Accordingly, the court held, "[w]e agree with those courts that have determined the First Amendment requires secular tribunals to refuse to interfere with a church's relationship with its ministers." *Id.*

Defendants also direct the Court to *Black v. Snyder*, 471 N.W.2d 715 (Minn.Ct. App.1991), wherein an associate pastor brought sexual harassment, breach of contract, defamation and wrongful termination claims after the congregation voted to discharge her employment. *Id.* at 717. The court noted that "federal courts have refrained from enforcing litigants' claims that require 'a searching and therefore impermissible inquiry into church doctrine.'" *Id.* at 720 (citing *Minker*, 894 F.2d at 1359–60). "Inquiry into a church's reasons for rejecting an individual for pastorship, even for the purpose of showing pretext, would cause excessive entanglement." *Id.* But if a pastor or minister brings claims that may be resolved by relying on "neutral methods of proof," the First Amendment does not foreclose judicial review. As these cases demonstrate, state courts share federal courts' reluctance to interfere with employment decisions affecting clergy. Given the foregoing authority, the Court finds that Defendants are also entitled to summary judgment as to Rabbi Leavy's breach of contract claim.[8]

8. Rabbi Leavy also asserts the Court may       inquire into the breach of contract claim

Finally, Rabbi Leavy attempts to demonstrate genuine issues of material fact regarding whether the Sioux City Jewish Community Board is a "religious organization" by asserting that she does not concede the Community Board is a religious organization and it has not demonstrated that it is such an organization. As Defendants note, Rabbi Leavy asserted in her Complaint that both Defendants were religious organizations established under the law of the State of Iowa, and Defendants admitted the same in their Answer.

based on a theory extracted from *Kupperman v. Congregation Nusach Sfard of Bronx*, 39 Misc.2d 107, 240 N.Y.S.2d 315 (N.Y.Sup. 1963). There, the plaintiff-rabbi requested injunctive relief against his congregation to prevent it from discharging him, cease interfering with the performance of his duties and requiring the congregation to continue paying his salary. *Id.* at 316. The defendant asserted that it had duly terminated the parties' written employment contract. *Id.*

The court noted that generally the pastoral relationship is removed from court review but observed that the reported cases involved congregations outside the Jewish faith. *Id.* at 318. The court explained certain traditional Jewish practices, and further noted the congregation's constitution and by-laws were silent as to terminating a rabbi's employment. *Id.* at 319–20. The governing documents also did not mention a "superior ecclesiastical authority." *Id.* Ultimately, the court concluded, "the defendant is empowered as an autonomous congregation to call, settle, dismiss or remove its clergy, and therefore, because of the nature of the structure of this religious faith, the appointment and tenure of this ordained spiritual leader does not involve questions of discipline and doctrine but is a temporal matter about which the court may inquire and consider in the light of the civil contractual rights and obligations of the parties." *Id.* at 320. The court determined the congregation had not complied with New York's Religious Corporations Law, which required certain notices and procedures to terminate the rabbi's employment. *Id.* at 321. Therefore, the procedures leading to the plaintiff's termination were a nullity. *Id.* at

## CONCLUSION

While beyond the limits of the current controversy, Rabbi Leavy would seem correct that Defendants do not escape all tort, contract, or statutory liability simply based on their status as religious organizations. However, when, as here, the claims presented leave the Court with a significant risk of entangling itself in the process by which a congregation chooses its leader, the First Amendment proscribes further action. Accordingly, Defendants' Motion for Summary Judgment (Clerk's No. 7)

321. Since the employment contract was subject to automatic renewal in the absence of proper notice, the court held the contract was renewed and that the defendant breached the contract by closing the synagogue and preventing the rabbi from performing his religious duties. *Id.*

The *Kupperman* case turned on an issue of statutory compliance regarding notice and avoided a collision with religion and the First Amendment. As such, it is factually distinct from the present case, which has no elements of procedural compliance and which involves Defendants' assertions regarding Rabbi Leavy's performance as a religious leader. Her contentions that First Amendment concerns can be avoided because the Congregation is without a hierarchy or codification of principles are unavailing. *See also Saffra v. Rockwood Park Jewish Ctr., Inc.*, 239 A.D.2d 507, 658 N.Y.S.2d 43 (N.Y.App.Div.1997) (noting *Kupperman* stands for the principle that a *simple* employment contract is capable of construction by the courts); *Zimbler v. Felber*, 111 Misc.2d 867, 445 N.Y.S.2d 366 (N.Y.Sup.1981) (disagreeing with *Kupperman's* attempt to distinguish the nature of the rabbinic relationship from clergy in other denominations, stating "[i]t was precisely this kind of substantive 'governmental evaluation' of religious practices, and the entanglement of 'government in difficult classifications of what is or is not religious' which has been categorized by the U.S. Supreme Court as 'excessive governmental entanglement with religion' that truly threatens private liberty and public order alike").

must be **granted.** The above-entitled action is **dismissed.**

**IT IS SO ORDERED.**